1

**BURSOR & FISHER, P.A.**

2

L. Timothy Fisher (State Bar No. 191626)
Brittany S. Scott (State Bar No. 327132)

3

1990 North California Blvd., Suite 940
Walnut Creek, CA 94596

4

Telephone: (925) 300-4455
Facsimile: (925) 407-2700

5

Email: ltfisher@bursor.com

6

        bscott@bursor.com

7

*Attorneys for Plaintiff*

8

9

                    **UNITED STATES DISTRICT COURT**

10

                **NORTHERN DISTRICT OF CALIFORNIA**

11

12

MICHAEL MAHONEY, individually and on
behalf of all others similarly situated,

Case No.

13

                        Plaintiff,

**CLASS ACTION COMPLAINT**

14

        v.

15

ALLY FINANCIAL INC.,

**DEMAND FOR JURY TRIAL**

16

17

                        Defendant.

18

19

20

21

22

23

24

25

26

27

28

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Michael Mahoney files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Ally Financial Inc. ("Defendant" or "Ally").   Plaintiff brings this action based upon personal knowledge of the facts pertaining to himself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all California residents who have accessed and used ally.com, a website that Defendant owns and operates.

2.      Defendant aids, employs, agrees with, or otherwise enables third parties, including LogRocket, Inc. ("LogRocket"), Content Square, Inc. ("Clicktale"), Datadog, Inc. ("Datadog"), Qualtrics, LLC ("Qualtrics") (collectively, the "Session Replay Providers"), and Meta Platforms, Inc. ("Facebook") (collectively, along with the Session Replay Providers, the "Third Parties"), to eavesdrop on communications sent and received by Plaintiff and Class Members.   These include communications that contain sensitive and confidential information – i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA") and Cal. Fin. Code § 4050, et seq. (the "California Financial Information Privacy Act" or "CalFIPA"). By failing to procure consent before enabling the Third Parties to intercept these communications, Defendant violated the California Invasion of Privacy Act ("CIPA") §§ 631-632.

## PARTIES

3.      Plaintiff Michael Mahoney is a resident and citizen of San Francisco, California. On or around October 31, 2007, Plaintiff Mahoney created a Facebook account.  Numerous times, including in or around November 2023 and December 2023, Plaintiff Mahoney visited a website operated by Defendant, ally.com (the "Website"), on the same browser that he used to access Facebook.  Plaintiff Mahoney was in California when he visited the Website.  Upon accessing the Website, as alleged in greater detail below, Plaintiff Mahoney searched for and browsed financial information, opened an Ally account, and used Ally's online financial services (i.e., online banking).   Each of these communications was intercepted in transit by the Third Parties—as enabled by Defendant—including communications that contained Plaintiff Mahoney's confidential,

"nonpublic personal information" as defined by the Gramm-Leach-Bliley Act and CalFIPA. Neither Defendant nor the Third Parties procured Plaintiff Mahoney's prior consent to this interception. Below is an image of Plaintiff's activity off Meta technologies, evincing activity received from the Website.[1]



4.      Defendant Ally Financial Inc. is a Delaware corporation with its principal place of business at 500 Woodward Avenue, Detroit, Michigan, 48226. Defendant offers banking services at over 43,000 Allpoint ATMs throughout the United States, including in California.[2] Defendant also provides a variety of financial services to Californians, whom it knows to reside in the State based on address information that they must provide during Ally's account opening processes.

<u>**JURISDICTION AND VENUE**</u>

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

6.      The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in California, and Plaintiff's claims arise out of Defendant's forum-related activities. Plaintiff accessed and navigated the Website while in California, and Plaintiff's communications with Defendant were thus wiretapped by the Third Parties in California.

---

[1] *See* https://www.facebook.com/help/2207256696182627.

[2] https://www.ally.com/bank/find-atms/.

7.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## FACTUAL BACKGROUND

**I.      The California Invasion of Privacy Act**

8.      The California Legislature enacted the Invasion of Privacy Act to protect certain privacy rights of California citizens.  The legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

9.      The California Supreme Court has repeatedly stated an "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*." *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added)

10.     Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas v. Clark*, 38 Cal. 3d 355, 360-61 (1985) (emphasis added; internal citations omitted).

11.     As part of CIPA, the California Legislature enacted § 631(a), which prohibits any person or entity from [i] "intentionally tap[ping], or mak[ing] any unauthorized connection … with any telegraph or telephone wire," [ii] "willfully and without the consent of all parties to the communication … read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing over any wire, line, or cable, or is being sent

from, or received at any place within [California]," or [iii] "us[ing], or attempt[ing] to use . . . any information so obtained."

12.    CIPA § 631(a) also penalizes [iv] those who "aid[], agree[] with, employ[], or conspire[] with any person" who conducts the aforementioned wiretapping, or those who "permit" the wiretapping.

13.    As part of the Invasion of Privacy Act, the California Legislature additionally introduced Penal Code § 632(a), which prohibits any person or entity from "intentionally and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication."

14.    A "confidential communication" for the purposes of CIPA § 632 is "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto."  Cal. Penal Code § 632(c).

15.    Individuals may bring an action against the violator of CIPA §§ 631 and 632 for $5,000 per violation.  Cal. Penal Code § 637.2(a)(1).  Plaintiff does so, here, against Defendant.

## II.    The Gramm-Leach-Bliley Act and California Financial Information Privacy Act

16.    As Congress and the California Legislature recognized, "nonpublic personal information" is confidential.

17.    Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i)    Personally identifiable financial information; and

(ii)    Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

18.    Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i)    A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

     (ii)     About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

     (iii)    [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

    (2) Examples—(i) Information included. Personally identifiable financial information includes:

     (A)    Information a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service;

     (B)    Account balance information, payment history, overdraft history, and credit or debit card purchase information;

     (C)    The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

     (D)    Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

     (E)    Any information that a consumer provides to [a financial institution] or that [a financial institution] or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account;

     (F)    Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server); and

     (G)    Information from a consumer report.

19.     In passing CalFIPA, the California Legislature "intend[ed] for financial institutions to provide their consumers notice and meaningful choice about how consumers' nonpublic personal information is shared or sold by their financial institutions[]" and "inten[ded] . . . to afford persons greater privacy protections than those provided in Public Law 106-102, the federal Gramm-Leach-Bliley Act[.]"  Cal. Fin. Code § 4051(a)-(b).

20.     Per Cal. Fin. Code § 4052(a):

"Nonpublic personal information" means personally identifiable financial

information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution. Nonpublic personal information does not include publicly available information that the financial institution has a reasonable basis to believe is lawfully made available to the general public from (1) federal, state, or local government records, (2) widely distributed media, or (3) disclosures to the general public that are required to be made by federal, state, or local law. Nonpublic personal information shall include any list, description, or other grouping of consumers, and publicly available information pertaining to them, that is derived using any nonpublic personal information other than publicly available information, but shall not include any list, description, or other grouping of consumers, and publicly available information pertaining to them, that is derived without using any nonpublic personal information.

21. Per Cal. Fin. Code § 4052(b):

"Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:

(1) Information a consumer provides to a financial institution on an application to obtain a loan, credit card, or other financial product or service.

(2) Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(3) The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4) Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5) Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(6) Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

(7)      Information from a consumer report.

22.     "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates."  Cal. Fin. Code § 4052.5.

23.     Thus, Plaintiff and Class Members' "nonpublic personal information" is confidential, under federal and California law.  Still, as alleged *infra*, such communications were intercepted in transit by the Third Parties—as enabled by Defendant—and neither Defendant nor the Third Parties procured Plaintiff's and Class Members' consent prior to this interception.

24.     This pattern of conduct, by Defendant, flouts the GLBA's and CalFIPA's respective purposes of enhancing "financial privacy[.]"[3]

### III.      Overview of Defendant's Website

25.     Defendant owns and operates the Website.  Defendant has integrated the Third Parties' wiretaps into the Website.

26.     On the Website, Website users can, *inter alia*, search for and browse financial information; open an Ally account; and use Ally's online financial services (i.e., online banking, credit card, investment, mortgage, auto financing, and personal loan services).  When doing so, Website users provide Defendant with confidential information, including "nonpublic personal information" under the GLBA and CalFIPA.

27.     Unbeknownst to Plaintiff and Class Members, however, Defendant aids, agrees with, employs, or otherwise enables the Third Parties to eavesdrop on those confidential communications using their respective wiretaps, as set out *infra*.

28.     Website users' confidential communications are the product of Website users affirmatively entering, and interacting with, information on the Website (*i.e.*, the confidential communications are not procedurally or automatically generated).  Instead, as set out below, the

---

[3] http://www.leginfo.ca.gov/pub/03-04/statute/ch_0201-0250/ch_241_st_2003_sb_1.  *See also* https://leginfo.legislature.ca.gov/faces/billNavClient.xhtml?bill_id=200320040SB1.

confidential communications stem from Website users typing into data fields, conveying responses to questions and prompts, and actively making other selections. All of the foregoing is information created through the intent of Website users: information created by and in response to Website users' communicative inputs; information created by and in response to Website users' intended messages to the Website and Defendant; and information created by and in response to Website users' having conveyed and expressed their respective desires that the Website would supply them with certain, highly personalized, types of information and/or responses.

29.    Website users may search for and browse financial information. To do so they may, *inter alia*, utilize the Website's search bar, browse the Website's menu of topics and pages, and navigate said pages as well as the links contained therein:





30.    Website users may also open an Ally account. To do so, a user must browse for and select the type of account (i.e., checking, savings, money market, IRA, CD, credit card, mortgage, auto loan, etc.) that they would like to open. Then, the user notifies Ally of the amount that they intend to deposit and/or borrow. Finally, the user either logs in with an existing Ally login or proceeds to check out by entering information about themself, including first name, middle name,

last name, date of birth, citizenship, occupation, email address, phone number, home address (with city, state, and ZIP code), and/or social security number.  After this, the user can submit their account opening application, deposit and/or access money in said account, and enroll in the *infra* online financial services:













31. Additionally, Website users may log into and use Ally's online financial services (i.e., online banking, credit card, investment, mortgage, auto financing, and personal loan services):





**IV.    The Session Replay Providers, as Enabled by Defendant, Wiretap Californians' Communications, in Violation of CIPA**

    **A.    Overview of Session Replay**

    32.    LogRocket, Clicktale, Datadog, and Qualtrics each provide a software-as-a-service (SaaS) called "session replay."

    33.    Session replay, as noted in a 2017 piece by Princeton University researchers, is "unlike typical [Internet] analytics services [like cookies] that provide aggregate statistics[. Rather,] these scripts are intended for the recording and playback of individual browsing sessions, as if someone is looking over your shoulder."[4]  That is, session replay works by using "embedded snippets of code … [that] watch and record a visitor's every move on a website, in real time."[5]

    34.    LogRocket explains, its "[b]est-in-class session replay" works via "100% accurate reproduction and playback of every user's DOM or mobile screen structure (including iFrames)[.]"[6]  In a webpage regarding "Data Collected" by its SaaS, LogRocket further delineates how "LogRocket leverages the MutationObserver API to capture 'videos' of users in your app."[7]  The "MutationObserver interface provides the ability to watch for changes being made to the DOM tree."[8]  The "Document Object Model (DOM) is the data representation of the objects that comprise the structure and content of a document on the web."[9]

    35.    Clicktale explains, in a page titled "Collected Data[,]" that "[o]nce communication is established, [it] will start tracking the following events and pass them over to [its] SDK: Pageviews manually triggered (with the dedicated command)[;] [t]ransactions manually triggered

---

[4] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Nov. 15, 2017, https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/.

[5] Tomas Foltyn, *What's the Deal with Session-Replay Scripts?*, WELIVESECURITY, Apr. 20, 2018, https://www.welivesecurity.com/2018/04/20/whats-deal-session-replay-scripts/.

[6] LOGROCKET, SESSION REPLAY FOR DEVELOPERS, https://logrocket.com/features/session-replay-developers.

[7] LOGROCKET, DATA COLLECTED, https://docs.logrocket.com/docs/data-collected.

[8] MOZILLA CORPORATION, MUTATIONOBSERVER, https://developer.mozilla.org/en-US/docs/Web/API/MutationObserver.

[9] MOZILLA CORPORATION, INTRODUCTION TO THE DOM, https://developer.mozilla.org/en-US/docs/Web/API/Document_Object_Model/Introduction.

(with the dedicated command)[;] [d]ynamic variables manually triggered (with the dedicated command)[;] [g]estures automatically detected: tap, double tap, swipes (with finger direction), pinches (in and out)[;] HTML DOM and DOM Mutation when session replay is activated[; and] HTML DOM when a snapshot of the screen is triggered by the SDK[.]"[10]

36.    Datadog explains, "Session replay is . . . done by capturing Document Object Model (DOM) mutations and transforming them into reproductions of user sessions. The DOM is an interface that translates web document elements into objects that programs can manipulate. Session replay logs every change made to the DOM, such as users entering or retrieving information, as an event."[11]

37.    Qualtrics explains, "[s]ession replay works by logging 'events', and turning those events into a reconstruction. Every time a user moves their mouse over a website element[,] clicks a button, or taps a link, that event is logged in the session replay software. . . . The[se] 'events' . . . are essentially trackable logs that reference the various HTML, CSS, and JavaScript elements that power [a] website. These are changes (sometimes called mutations) to the Document Object Model, or DOM – the backend foundation of [a] website."[12]

38.    The end result is that LogRocket, Clicktale, Datadog, and Qualtrics' session replay wiretaps provide real-time recordings of users' interactions on the Website, while those same interactions are being transmitted over the Internet.  In other words, session replay is used by LogRocket, Clicktale, Datadog, and Qualtrics to surreptitiously capture and/or record, in real time, the keystrokes, mouse clicks and movement, scrolling, data entry, and/or other electronic communications of Website visitors.

39.    LogRocket states: "Session replay refers to the technique of recording and playing back user interactions and behaviors within a website or application. Fundamentally it's about

---

[10] CONTENTSQUARE, COLLECTED DATA, https://docs.contentsquare.com/en/webview-tracking-web-tag/collected-data/.

[11] DATADOG, SESSION REPLAY OVERVIEW, https://www.datadoghq.com/knowledge-center/session-replay/.

[12] QUALTRICS, SESSION REPLAY: DEFINITION, BENEFITS & HOW TO USE IT EFFECTIVELY, https://www.qualtrics.com/experience-management/customer/session-replay/.

capturing and storing actions performed by users, such as mouse movements, clicks, scrolling, and keyboard inputs, within the visual context of the user interface."[13] Further, LogRocket states: "session replay allows you to [] pause, play, and navigate through the session. This displays information about user activity, including clicks, scrolls, and mouse movements."[14]

40.    Clicktale states: "Session replay [] capture[s] a variety of data, including mouse movements, clicks, scrolls, and form inputs."[15] Clicktale makes clear, "[we] track[] all . . . interactions inside your site or app. The tracking data is then securely sent to [our] servers, where it is . . . prepared for analysis."[16]

41.    Datadog states that "Datadog [s]ession [r]eplay [can] view real-time user journeys[.] . . . With Datadog RUM's Session Replay feature, you can watch individual user sessions using a video-like interface. . . . Using Session Replay, you can observe how users traverse your website to get insight into how long it takes them to make decisions, what they hover over before clicking on something else, . . . and more. . . . For example, you might watch the user unsuccessfully attempt to enter their password[,] . . . [and other] text . . . [in] user input fields, such as credit card information, type forms, and text boxes[.]"[17] "The Session Replay recorder . . . record[s] events happening on a web page (such as DOM modification, mouse move, clicks, and input events) along with these events' timestamps."[18]

42.    Qualtrics states: "Session replay . . . lets brands reproduce a user's journey on websites, products, or mobile apps. Because these reproductions are visual – including things like

---

[13] LOGROCKET, SESSION REPLAY IN UX: DEFINITION, USE CASES, BENEFITS, https://blog.logrocket.com/ux-design/session-replay-ux-definition-use-cases-benefits/.

[14] LOGROCKET, SESSION REPLAY, https://docs.logrocket.com/docs/session-replay.

[15] CONTENTSQUARE, PLATFORM CAPABILITIES: SESSION REPLAY, https://contentsquare.com/platform/capabilities/session-replay/. *See also* CONTENTSQUARE, USER REPLAY: A CRITICAL TOOL FOR USER SESSION ANALYSIS IN 2024, https://contentsquare.com/blog/user-replay/ ("User Replay . . . enables companies to record and replay users' interactions with their website or application, including mouse movements, clicks, scrolls, and keypresses.").

[16] CONTENTSQUARE, CONTENTSQUARE DIGITAL EXPERIENCE ANALYTICS FAQ, https://contentsquare.com/support/faqs/.

[17] DATADOG, USE DATADOG SESSION REPLAY TO VIEW REAL-TIME USER JOURNEYS, https://www.datadoghq.com/blog/session-replay-datadog/.

[18] DATADOG, SESSION REPLAY, https://docs.datadoghq.com/real_user_monitoring/session_replay/.

mouse movements, scrolls, and clicks – session replay tools [are] incredibly useful[.]"[19]  Qualtrics says, "[t]he following fields are available in [] session replay[:] . . . clicks: The number of [] clicks that occurred during the session. . . . Replay link: A link to view a recording of the session. . . . Referrer: The webpage a user was on right before they landed on your website. Starting URL: The URL of your site the session started on. . . .  If you've added and published visitor details or custom events while setting up session replay, you can also view those[.]"[20] Per Qualtrics, "[c]ustom events capture the number of times a visitor interacts on your website for specific web events that you want to track, such as adding an item to a cart, clicking a link, or completing a purchase."[21]

43.     Session replay technology is not widely known by the public.  Most website owners don't disclose the use of session replay on their websites out of fear of unnerving website visitors and suppressing website traffic.  Any disclosures in privacy policies are futile, because by the time anyone will have seen such a disclosure, the session replay technology will have already been deployed.

44.     Further, as a 2017 study by Princeton University researchers recognized, "the extent of data collected by these services **far exceeds user expectations** [1]; text typed into forms is collected before the user submits the form, and precise mouse movements are saved, all without any visual indication to the user. This data can't reasonably be expected to be kept anonymous."[22]

45.     And session replay is not only highly intrusive, but dangerous.  The 2017 study by Princeton University researchers found that session replay technologies were collecting sensitive user information such as passwords and credit card numbers.  The research notes that this wasn't simply the result of a bug, but rather, insecure practices.[23]  Thus, session replay technologies such

---

[19] QUALTRICS, SESSION REPLAY: DEFINITION, BENEFITS & HOW TO USE IT EFFECTIVELY, https://www.qualtrics.com/experience-management/customer/session-replay/.

[20] QUALTRICS, SESSION REPLAY TAB, https://www.qualtrics.com/support/website-app-feedback/session-replay-tab/.

[21] QUALTRICS, SESSION REPLAY SECTION, https://www.qualtrics.com/support/website-app-feedback/settings-tab/session-replay-section/#CustomEvents.

[22] Steven Englehardt, *No boundaries: Exfiltration of personal data by session-replay scripts*, Nov. 15, 2017, https://freedom-to-tinker.com/2017/11/15/no-boundaries-exfiltration-of-personal-data-by-session-replay-scripts/. (emphasis added).

[23] *Id.*

---

as those operated by LogRocket, Clicktale, Datadog, and Qualtrics can leave users vulnerable to data leaks and the harms resulting therefrom.

**B.      Defendant Enables the Session Replay Providers to Wiretap Californians**

46.     Pursuant to agreements with LogRocket, Clicktale, Datadog, and Qualtrics, Ally voluntarily embedded the *supra* session replay wiretaps on its Website.  This allowed LogRocket, Clicktale, Datadog, and Qualtrics to surreptitiously collect interactions between Ally and its Website users.

47.     Some aspects of the operation of the LogRocket, Clicktale, Datadog, and Qualtrics wiretaps on the Website can be observed using developer tools – listing incoming and outgoing Website network transmissions.  Specifically, when the Website is loaded into a browser, the Website evinces LogRocket, Clicktale, Datadog, and Qualtrics network transmissions:

▼ General

| | |
|---|---|
| Request URL: | https://secure.ally.com/acs/device/events |
| Request Method: | OPTIONS |
| Status Code: | ● 200 OK |
| Remote Address: | 23.200.88.173:443 |
| Referrer Policy: | strict-origin-when-cross-origin |

▼ Response Headers

| | |
|---|---|
| Access-Control-Allow-Credentials: | true |
| Access-Control-Allow-Headers: | Set-Cookie, Authorization, TraceID, Channel, Referer, Accept, Cache-Control, Location, Content-Location, Retry-After, Vary, Allow, CSRFChallengeToken, Cookie, Content-Type, API-Key, GUID, cif, investId, userSessionId, creditCardId, Content-Security-Policy, Feature-Policy, Alloy-Response-Type, Content-Length, Pragma, Access-Control-Allow-Origin, Date, Server, Access-Control-Allow-Headers, Access-Control-Allow-Methods, Access-Control-Max-Age, X-TS-Client-Version, Origin, Access-Control-Allow-Credentials, X-Requested-With, AK_CLIENT_FINGERPRINT_TLS_FACTOR_HASH, Akamai-Header-Signature, User-Agent, Content-Signature, x-datadog-trace-id, x-datadog-parent-id, x-datadog-origin, x-datadog-sampling-priority, x-datadog-sampled, Ally-API-Dryrun, Expires, Csrftoken, Clientappname, Sessionid, App-Version, mock-services, gateway-header, username, x-dynatrace, x-dynatrace-application, x-dynatrace-origin-url, X-dynaTrace-RequestState, x-dtpc, x-dtreferer, x-dtc, X-Ruxit-Forwarded-For, X-ruxit-Apache-ServerNamePorts, X-ruxit-Disposition, Accept-Encoding, Content-Encoding, If-None-Match, If-Not-Modified-Since, If-Match, If-Range, tracecontext, x-host, zid |
| Access-Control-Allow-Methods: | GET, POST, PUT, DELETE, PATCH, OPTIONS |
| Access-Control-Allow-Origin: | https://www.ally.com |
| Access-Control-Expose-Headers: | mock-services, gateway-header |

▼ General

| | |
|---|---|
| Request URL: | https://zn0jrcasstp2ekclo-allyinsights.siteintercept.qualtrics.com/WRSiteInterceptEngine/?Q_ZID=ZN_0JRcaSsTp2EKClo |
| Request Method: | GET |
| Status Code: | ● 200 OK |
| Remote Address: | 104.17.208.240:443 |
| Referrer Policy: | strict-origin-when-cross-origin |

▼ Response Headers

| | |
|---|---|
| Access-Control-Allow-Headers: | Origin, X-Requested-With, Content-Type, Accept |
| Access-Control-Allow-Origin: | * |
| Age: | 238388 |
| Cache-Control: | public, max-age=3600, s-maxage=604800 |
| Cf-Bgj: | minify |
| Cf-Cache-Status: | HIT |
| Cf-Polished: | origSize=9889 |
| Cf-Ray: | 8598cf52996ac436-EWR |
| Content-Encoding: | br |
| Content-Security-Policy-Report-Only: | frame-ancestors 'self' *.qualtrics.com *.my.salesforce.com *.visualforce.com *.visual.force.com *.lightning.force.com; report-uri https://sjc1.qualtrics.com/csp-report |
| Content-Type: | application/javascript; charset=utf-8 |
| Date: | Thu, 22 Feb 2024 17:04:43 GMT |
| Edge-Control: | max-age=604800 |
| Etag: | W/"26a1-atzr6vKy3n+XgHqgv0Vglq+qR7w" |
| Permissions-Policy: | camera=(), geolocation=(), microphone=() |
| Referrer-Policy: | strict-origin-when-cross-origin |
| Server: | cloudflare |

V.    **Facebook, As Enabled by Defendant, Wiretaps Californians' Communications, in Violation of CIPA**

A.    **Overview of Facebook's Advertising Platform and the Meta Pixel**

48.    Facebook describes itself as a "real identity platform,"[24] meaning users are allowed only one account and must share "the name they go by in everyday life."[25]    To that end, when creating an account, users must provide their first and last name, along with their birthday and gender.[26]

49.    In 2021, Facebook generated $117 billion in revenue.[27]    Roughly 97% of that came from selling advertising space.[28]

50.    Facebook sells advertising space by highlighting its ability to target users.[29] Facebook can target users so effectively because it surveils user activity both on and off its site.[30] This allows Facebook to make inferences about users beyond what they explicitly disclose, like their "interests," "behavior," and "connections."[31]    Facebook compiles this information into a generalized dataset called "Core Audiences," which advertisers use to apply highly specific filters and parameters for their targeted advertisements.[32]

51.    Advertisers can also build "Custom Audiences."[33]    Custom Audiences enable

---

[24] Sam Schechner and Jeff Horwitz, *How Many Users Does Facebook Have? The Company Struggles to Figure It Out*, WALL. ST. J. (Oct. 21, 2021).

[25] FACEBOOK, COMMUNITY STANDARDS, PART IV INTEGRITY AND AUTHENTICITY, https://www.facebook.com/communitystandards/integrity_authenticity.

[26] FACEBOOK, SIGN UP, https://www.facebook.com/

[27] FACEBOOK, META REPORTS FOURTH QUARTER AND FULL YEAR 2021 RESULTS, https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx

[28] *Id.*

[29] FACEBOOK, WHY ADVERTISE ON FACEBOOK, https://www.facebook.com/business/help/205029060038706.

[30] FACEBOOK, ABOUT FACEBOOK PIXEL, https://www.facebook.com/business/help/742478679120153?id=1205376682832142.

[31] FACEBOOK, AD TARGETING: HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[32] FACEBOOK, EASIER, MORE EFFECTIVE WAYS TO REACH THE RIGHT PEOPLE ON FACEBOOK, https://www.facebook.com/business/news/Core-Audiences.

[33] FACEBOOK, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227?id=2469097953376494.

---

advertisers to reach "people who have already shown interest in [their] business, whether they're loyal customers or people who have used [their] app or visited [their] website."[34]   With Custom Audiences, advertisers can target existing customers directly, and can also build "Lookalike Audiences," which "leverage[] information such as demographics, interests, and behavior from your source audience to find new people who share similar qualities."[35]

52.   Unlike Core Audiences, advertisers can build Custom Audiences and Lookalike Audiences only if they first supply Facebook with the underlying data.   They can do so through two mechanisms: by manually uploading contact information for customers, or by utilizing Facebook's "Business Tools."[36]

53.   As Facebook puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate with Facebook, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[37]

54.   Put succinctly, Facebook's Business Tools are bits of code that advertisers can integrate into their website, mobile applications, and servers, thereby enabling Facebook to intercept and collect user activity on those platforms.

55.   The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user downloads a mobile application or makes a purchase.[38]   However, Facebook's Business

---

[34] FACEBOOK, AD TARGETING, HELP YOUR ADS FIND THE PEOPLE WHO WILL LOVE YOUR BUSINESS, https://www.facebook.com/business/ads/ad-targeting.

[35] Facebook, About Lookalike Audiences, https://www.facebook.com/business/help/164749007013531?id=401668390442328.

[36] FACEBOOK, CREATE A CUSTOMER LIST CUSTOM AUDIENCE, https://www.facebook.com/business/help/170456843145568?id=2469097953376494; FACEBOOK, CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341?id=2469097953376494.

[37] FACEBOOK, THE FACEBOOK BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[38] See FACEBOOK, FACEBOOK PIXEL, ACCURATE EVENT TRACKING, ADVANCED, https://developers.facebook.com/docs/facebook-pixel/advanced/; see also FACEBOOK, BEST PRACTICES FOR FACEBOOK PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

Tools can also track other events.  Facebook offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[39]  Advertisers can even create their own tracking parameters by building a "custom event."[40]

56.     One such Business Tool is the Facebook Tracking Pixel.  Facebook offers this piece of code to advertisers, like Defendant, to integrate into their websites.  As the name implies, the Facebook Tracking Pixel "tracks the people and type of actions they take."[41]  When a user accesses a website hosting the Facebook Tracking Pixel, Facebook's software surreptitiously directs the user's browser to simultaneously send a separate message to Facebook's servers.  This second, secret transmission contains the original GET request sent to the host website, along with additional data that the Pixel is configured to collect.  This transmission is initiated by Facebook code and concurrent with the communications with the host website.  Two sets of code are thus automatically run as part of the browser's attempt to load and a website: the website's own code, and Facebook's embedded code.

57.     An example illustrates the point.  Take an individual who navigates to the Website and clicks on a button to browse Defendant's offerings.  Once that button is clicked, the individual's browser sends a GET request to Defendant's server requesting that server to load the particular webpage.  Because Defendant utilizes the Facebook Tracking Pixel, Facebook's embedded code, written in JavaScript, sends secret instructions back to the individual's browser, without alerting the individual that this is happening.  Facebook causes the browser to secretly and simultaneously duplicate the communication with Defendant, transmitting it to Facebook's servers alongside additional information that transcribes the communication's content and the individual's identity.  This entire process occurs within milliseconds.

58.     In other words, when a user communicates with Defendant's Website, those

---

[39] FACEBOOK, SPECIFICATIONS FOR FACEBOOK PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[40] FACEBOOK, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[41] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting.

communications are simultaneously and contemporaneously duplicated and sent to Facebook at the same time as they are being sent to Defendant.  Thus, Facebook's interception of these communications occurs "in transit."  *See*, *e.g.*, *In re Facebook Internet Tracking Litig.*, 956 F.3d 589, 608 (9th Cir. 2020) ("Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion…"); *Revitch v. New Moosejaw, LLC*, 2019 WL 5485330, at *2 (N.D. Cal. Oct. 23, 2019) ("Even if the browser caused a parallel signal to be sent to NaviStone, that intervention happened while the signal was already in transit from Revitch's device. Section 631's protections extend explicitly to the beginnings and ends of communications…"); *James v. Walt Disney Co.*, --- F. Supp. 3d ---, 2023 WL 7392285, at *15-16 (N.D. Cal. Nov. 8, 2023) (finding in-transit interception was alleged based on similar process to the one alleged herein).

59.    After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

60.    Facebook's other Business Tools function the same.  For mobile applications, advertisers can utilize the Facebook SDK, which contains "component SDKs," like the App Events API, allowing advertisers to track events on their mobile apps so they can "measure ad performance and build audiences for ad targeting."[42]

61.    Advertisers can also utilize the "Conversions API."  The Conversions API lets advertisers circumvent a user's choice to exercise privacy controls.[43]  More technically, the Conversions API is Facebook code that advertisers can implement server-side.[44]  Because it operates server-side, the Conversions API ignores users' decision to opt out of tracking, collecting the same data it would otherwise through "a connection between an advertiser's server and Facebook."[45]

---

[42] FACEBOOK, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[43] FACEBOOK, CONVERSIONS API, https://developers.facebook.com/docs/marketing-api/conversions-api.  This refers to device specific privacy controls.

[44] *Id.*

[45] *Id.*

62.     When the Conversions API collects "[s]erver events," those data points are "linked to a Meta Pixel ID and are processed like web events sent via Pixel."[46]   As with the Facebook Tracking Pixel, the Conversions API intercepts these communications contemporaneously and surreptitiously. [47]   Facebook "recommend[s] that advertisers implement the Conversions API alongside their Meta Pixel and follow other best practices."[48]

**B.      Defendant Enables Facebook, through the Meta Pixel, to Wiretap Californians**

63.     Facebook, as enabled by Defendant, contemporaneously intercepts the URLs of webpages visited by Website users and when Website users have progressed through portions of the Website (which requires affirmative button presses on the part of Website users)—using the Facebook Tracking Pixel:

```
id: 480340903190872
ev: PageView
dl: https://www.ally.com
rl:
if: false
ts: 1708220760946
sw: 1280
sh: 720
v: 2.9.147
r: stable
ec: 0
o: 4124
fbp: fb.1.1708201744074.955415314
```

```
id: 480340903190872
ev: Step1
dl: https://secure.ally.com
rl:
if: false
ts: 1708222836924
sw: 1280
sh: 720
v: 2.9.147
r: stable
ec: 1
o: 4124
fbp: fb.1.1708201744074.955415314
```

```
id: 480340903190872
ev: Step2
dl: https://secure.ally.com
rl:
if: false
ts: 1708222865942
sw: 1280
sh: 720
v: 2.9.147
r: stable
ec: 3
o: 4124
fbp: fb.1.1708201744074.955415314
```

```
id: 480340903190872
ev: Step3
dl: https://secure.ally.com
rl:
if: false
ts: 1708222909500
sw: 1280
sh: 720
v: 2.9.147
r: stable
ec: 5
o: 4124
fbp: fb.1.1708201744074.955415314
```

---

[46] *Id.*

[47] FACEBOOK, HANDLING DUPLICATE PIXEL AND CONVERSIONS API EVENTS, https://
developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel-and-server-events/
("Once your event fulfills both conditions, we keep the first one and remove the following one.  If a server and browser event arrive at approximately the same time (within 15 seconds of each other), we favor the browser event.").

[48] *Id.*

64.     Along with the foregoing, Facebook's Pixels—as enabled by Defendant—pair event data with a user's Facebook ID.

65.     When a user accesses the Website while logged into Facebook, the Pixel will compel that user's browser to transmit the c_user cookie, which contains the user's unencrypted Facebook ID.  When accessing the Website, Facebook received the following cookies, including the c_user cookie[49]:



66.     When a Website visitor's browser has recently logged out of an account, Facebook compels the visitor's browser to send a smaller set of cookies[50]:

67.     No matter the circumstances, Facebook receives at least one cookie from a Website visitor's browser:

68.     The fr cookie contains, at least, an encrypted Facebook ID and browser identifier.[51]

[49] Pictured here also is the _fbp cookie, which is sent as a first-party cookie.

[50] Pictured here also is the _fbp cookie, which is sent as a first-party cookie.

The _fbp cookie contains, at least, an unencrypted value that uniquely identifies a browser.[52]   The datr cookies also identifies a browser.    Facebook, at a minimum, uses the fr and _fbp cookies to identify users.[53]

69.    The fr cookie expires after ninety days unless the visitor's browser logs back into Facebook.[54]  If that happens, the timer resets and another ninety days begins to accrue.[55]

70.    The _fbp cookie expires after ninety days unless the visitor's browser accesses the same website.[56]  If that happens, the time resets, and another ninety days begins to accrue.[57]

71.    The Facebook Tracking Pixel uses both first- and third-party cookies.  A first-party cookie is "created by the website the user is visiting"—*i.e.*, the Website.[58]  A third-party cookie is "created by a website with a domain name other than the one the user is currently visiting"—*i.e.*, Facebook.[59]  The _fbp cookie is always transmitted as a first-party cookie.  A duplicate _fbp cookie is sometimes sent as a third-party cookie, depending on whether the browser has recently logged into Facebook.

72.    Facebook, at a minimum, uses the fr, _fbp, and c_user cookies to link to Facebook IDs and corresponding Facebook profiles.

73.    Defendant uses these cookies to pair event data with personally identifiable information so it can later retarget consumers on Facebook.

74.    Defendant also uses "Advanced Matching."  With Advanced Matching,

---

[51] DATA PROTECTION COMMISSIONER, FACEBOOK IRELAND LTD, REPORT OF RE-AUDIT (Sept. 21, 2012),  http://www.europe-v-facebook.org/ODPC_Review.pdf.

[52] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[53] *Id.*

[54] *Id.*

[55] Confirmable through developer tools.

[56] *See* FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policy/cookies/.

[57] Also confirmable through developer tools.

[58] PC MAGAZINE, FIRST-PARTY COOKIES, https://www.pcmag.com/encyclopedia/term/first-party-cookie.  This is confirmable by using developer tools to inspect a website's cookies and track network activity.

[59] *Id.*  This is also confirmable by tracking network activity.

---

Defendant's Pixels "look for recognizable form field and other sources on your website that contain information such as first name, last name and email."[60]  That information is recorded, "along with the event, or action, that took place."[61] This information is also "hashed,"[62] meaning it is "[a] computed summary of digital data that is a one-way process." In other words, it "cannot be reversed back into the original data."[63]



    75.    Defendant discloses this information to Facebook so it can better match visitors to their Facebook profiles.

    76.    As part of Advanced Matching, Defendant enabled "Automatic Advanced Matching."  That means Defendant configured the pixel to scan form fields containing a user's email address, first name, last name, phone number, gender, zip code, city and state.[64] The highlighted line shows that Defendant enabled Automatic Matching.



---

[60] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

[61] *Id.*

[62] DEFINITION OF HASH, https://www.pcmag.com/encyclopedia/term/hash.

[63] *Id.*

[64] Facebook provides a corresponding look-up table: FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

77.     Defendant knows that Facebook will match the Advanced Matching parameters with a customer's subsequent activity, thereby helping Defendant "[i]ncrease the number of attributed conversions," "[i]ncrease [their] Custom Audience size," and "[d]ecrease the cost per conversion."[65]

78.     By compelling a visitor's browser to disclose the Advanced Matching parameters and event data for videos, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify a specific individual's website activity, including what webpages they visit and what items they view and purchase.

## VI.     The Third Parties Use Californians' Data for their Own Purposes

79.     When the Third Parties use their respective wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.   Instead, the Third Parties—separate and distinct entities from the parties to the conversations—use the wiretaps to eavesdrop upon, record, extract data from, and analyze conversations to which they are not parties.   The Third Parties, themselves, collect the contents of said conversations.   That data is then analyzed by the Third Parties before being provided to any entity that was a party to the conversations (like Defendant).

80.     The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes.

81.     In its "Terms and Conditions," LogRocket states: "Customer agrees that it will not provide any Sensitive Data to LogRocket. If Customer discovers that due to human error or otherwise, Customer Data does include Sensitive Data, Customer will promptly notify LogRocket and provide sufficient information to LogRocket to locate such Sensitive Data and LogRocket will use commercially reasonable efforts to delete such Sensitive Data from its systems. . . . Customer grants to LogRocket a non-exclusive, royalty-free license to access and use Customer Data in order to provide the Services to Customer and to monitor and improve its services. . . . LogRocket may use, reproduce and disclose Customer Data that is anonymized, de-identified, or is otherwise not

---

[65] FACEBOOK, ABOUT ADVANCED MATCHING FOR WEB, https://www.facebook.com/business/help/611774685654668?id=1205376682832142.

reasonably associated or linked to Customer (or any other identifiable individual person or entity) ('Anonymized Data') for product improvement and other purposes consistent with LogRocket's Privacy Policy. This right to use Anonymized Data will survive termination of this Agreement."[66] Thus, LogRocket has the capability to use the wiretapped data it collects to monitor and improve its products and services.

82.   In its "Contentsquare Master Service Agreement," Clicktale states: "Customer grants Contentsquare and its Affiliates a non-exclusive, perpetual, worldwide, royalty-free, right and license to (i) compile and use Customer Data, strictly in order to research, develop, modify, improve or support the services provided by Contentsquare and its Affiliates; (ii) use Customer Data in an anonymous or aggregated form where no such information could directly identify or will reasonably be used to identify Customer, Customer's Users or its Visitors, for benchmarking or machine learning purposes; and (iii) collect and use data, information, or insights generated or derived from the use of the CS Service for its business purposes, including industry analysis, analytics, marketing, and developing, training and improving its products and services."[67]   Thus, Clicktale has the capability to use the wiretapped data it collects to research, develop, modify, improve, train, and/or support its products and services, conduct benchmarking and machine learning, and pursue other business purposes like industry analysis, analytics, and marketing.

83.   In its "Master Subscription Agreement," Datadog states: "Customer authorizes Datadog to use information about Customer's configuration and use of the Services ('Usage Data'), Customer Data and Account Data to: (a) manage Customer's account, including to calculate Fees (as defined in Section 5.1); (b) provide and improve the Services and Support (as defined in Section 3); and (c) provide insights, service and feature announcements, and other reporting. Customer agrees that Datadog may use aggregated or anonymized Customer Data and Usage Data for any business purpose during or after the term of this Agreement, including without limitation to develop and improve Datadog products and services and to create and distribute insights, reports

---

[66] LogRocket, Terms and Conditions, https://logrocket.com/terms-and-conditions/.

[67] Clicktale, Contentsquare Master Service Agreement, https://contentsquare.com/legal/terms-conditions/.

and other materials."[68]   Thus, Datadog has the capability to use the wiretapped data it collects to manage accounts, calculate fees, develop and improve its services, provide support, create and provide insights, create and provide service and feature announcements, create and provide other reporting, and pursue other business purposes.

84.     In its "General Terms and Conditions for Qualtrics Services ('GTC')," Qualtrics states: "Qualtrics or Qualtrics' Affiliates may create analyses using, in part, Customer Data and information derived from Customer's use of the Cloud Service and Professional Services, as set forth below ('Analyses'). . . . (b) Analyses may be used for the following purposes: (1) product improvement (in particular, product features and functionality, workflows, and user interfaces) and development of new Qualtrics products and services, (2) improving resource allocation and support, (3) internal demand planning, (4) training and developing machine learning algorithms, (5) improving product performance, (6) verification of security and data integrity, and (7) identification of industry trends and developments, creation of indices and anonymous benchmarking."[69]   Thus, Qualtrics has the capability to use the wiretapped data it collects for product improvement, product and service development, resource allocation and support, internal demand planning, training and developing machine learning algorithms, security and data integrity, identification of industry trends, and benchmarking.

85.     Facebook confirms, in its "Meta Business Tools Terms,"[70] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant. For instance, Facebook can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."   In other words, Facebook can use the wiretapped information for its own "research and development," and well as to "protect" its own products and services.   Facebook can also connect all information it collects to analyze and generate reports

---

[68] DATADOG, MASTER SUBSCRIPTION AGREEMENT, https://www.datadoghq.com/legal/msa/.

[69] QUALTRICS, GENERAL TERMS AND CONDITIONS FOR QUALTRICS SERVICES ("GTC"), https://success.qualtrics.com/rs/542-FMF-412/images/Qualtrics%20Online%20GTC%20DPA%20Template%2020230816.pdf.

[70] FACEBOOK, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[71]   Further, Facebook can use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[72]   Finally, Facebook can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[73]   Thus, Facebook has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendant, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

## VII.   Defendant Never Received Users' Consent to Disclose their Confidential Communications to the Third Parties

86.   To summarize the above allegations, the Third Parties, as enabled by Defendant, collect the contents of Californians' communications with the Website using the wiretaps described *supra*.  These communications include, but are not limited to, "nonpublic personal information," as defined by the GLBA and CalFIPA.  *See* Statement of Facts § I-VI, *supra*.  This is information that is affirmatively entered by users on the Website.  *Id*.  This information is not anonymized because Defendant enables the Third Parties to link users' communications with personal identifiers (i.e., name, email address, Facebook ID, etc.), which reveal their identities.  *Id*.

87.   Crucially, neither Defendant nor the Third Parties procure prior consent from Californians for the Third Parties to engage in this wiretapping.

88.   On its "Privacy"[74] webpage, Ally states:

---

[71] *Id*.

[72] *Id*.

[73] *Id*.

[74] ALLY, PRIVACY, https://www.ally.com/privacy/.

We may share the personal information we collect about you with third parties, such as companies performing services on our behalf to provide the products or services you have requested.
. . .
We may share information about you with . . . nonaffiliates for analysis, market research and marketing purposes as allowed by law.

Finally, we may disclose your personal information as otherwise permitted or required by law.
. . .
We use a variety of technologies, including cookies, to collect information about your online/mobile activity when you visit our website.
. . .
You can disable cookies by making the appropriate selection from your browser options to inform you when cookies are set or to prevent cookies from being set.
. . .
When you visit an Ally website or app, we may collect and store personal information from your web browser or device to share with third parties to target (cross-context behavioral) advertising to you. If collection and sharing is enabled on the Ally website or app you visit, you have a right to opt out of Ally's sharing of your personal information with third parties for targeted advertising purposes.
. . .
If the Ally website or app you're visiting has collection and sharing for targeted advertising enabled, you can choose whether we share your personal information by utilizing one of the following methods:

> Ally websites and apps: Tap the Targeted Advertising Preferences link in the footer of the Ally website or app and select Don't Share Information[.]

> Ally websites (not available for Ally apps): Use a browser-based opt-out preference signal, like the Global Privacy Control (GPC), to automatically exercise your right to opt-out of sharing for targeted advertising purposes[.]

Keep in mind, in some cases you may need to opt out again if you delete your cookies, reinstall our app, or use another device or browser.

89.     But, as set out *supra* and *infra*, Defendant allows for the collection of Website users' personal information, including by the Third Parties, even when it is *not* permitted or required by the law and even when Defendant has not received consent from Website users to do so.  Defendant's means for individuals to "choose whether [it] share[s] [their] personal information" are ineffective and do not amount to receiving consent.  The "Targeted Advertising

Preferences" webpage[75] is buried on the bottom of ally.com and its subsidiary webpages, in an inconspicuous hyperlink whose label ("Targeted Advertising Preferences") provides neither a clear nor comprehensive understanding of that which it encompasses. The "Targeted Advertising Preferences" webpage[76] itself merely reads: "When you visit our website and app, we collect and store information from your web browser or device to provide targeted advertising on third-party websites or apps. Select Don't Share if you don't want us to share your information for this purpose. Keep in mind, in some cases you may need to opt out again if you delete your cookies, reinstall our app, or use another device or browser. Allow Sharing[/]Don't Share[.]" Based on the *supra* developer tools (listing incoming and outgoing Website network transmissions), Ally allows for the collection of Website users' personal information, including by the Third Parties, even before a Website user affirmatively selects "Allow Sharing[.]" And Ally's suggestion to "[u]se a browser-based opt-out preference signal" does not amount to soliciting Website users' consent to the pattern of conduct described herein.

90. Likewise, Facebook never receives consent from Website users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information. In fact, Facebook expressly warrants the opposite.

91. When first signing up for Facebook, a user assents to three agreements: the Facebook Terms of Service,[77] the Cookies Policy,[78] and the Privacy Policy.[79] For California residents, Facebook also publishes a United States Regional Privacy Notice.[80]

92. Facebook's Terms of Service begin by stating that "[p]rotecting people's privacy is

---

[75] ALLY, TARGETED ADVERTISING PREFERENCES, https://www.ally.com/privacy/advertising-preferences/.

[76] *Id.*

[77] FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[78] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[79] FACEBOOK, PRIVACY POLICY, https://www.facebook.com/privacy/policy. *See also* https://mbasic.facebook.com/privacy/policy/printable/.

[80] FACEBOOK, UNITED STATES REGIONAL PRIVACY NOTICE, https://www.facebook.com/privacy/policies/uso/.

central to how we've designed our ad system."[81]   The Terms of Service then prohibit anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent[.]"[82]

93.    Facebook's Privacy Policy describes how Facebook receives information like "[w]ebsites you visit and cookie data, like through Social Plugins or the Meta Pixel[,] . . . [h]ow you use our partners' products and services, online or in person[,] . . . [and] information like your email address, cookies and advertising device ID[.]"[83]   Specifically, Facebook acknowledges that "[w]e collect and receive information from partners, . . . [and] receive this information whether or not you're logged in or have an account on our Products."[84]

94.    Facebook then offers an express representation: "We require partners to have the right to collect, use and share your information before giving it to us."[85]   Facebook also acknowledges collecting "information with special protections[,]" meaning information that "could have special protections under the laws of your jurisdiction[,]" but critically, only sensitive information that users "choose to provide."[86]

95.    Facebook's Cookies Policy ratifies those representations, stating "the Privacy Policy will apply to our processing of the data that we collect via cookies."[87]

96.    For California residents, Facebook reiterates that policy: "We require each of these partners to have rights to collect, use, and disclose your information before providing any information to us."[88]   The United States Regional Privacy Notice also restricts Facebook's ability

---

[81]FACEBOOK, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[82] *Id.*

[83] FACEBOOK, PRIVACY POLICY, https://www.facebook.com/privacy/policy.  *See also* https://mbasic.facebook.com/privacy/policy/printable/.

[84] *Id.*

[85] *Id.*

[86] *Id.*

[87] FACEBOOK, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[88] FACEBOOK, UNITED STATES REGIONAL PRIVACY NOTICE, https://www.facebook.com/privacy/policies/uso/.

---

to collect "sensitive personal information," stating they "will only use or disclose it either with your specific consent when required, or as otherwise permitted by law, including the CCPA."[89]

97.     Facebook's other representations reinforce these warranties.  In its Advertising Policy, Facebook states "[w]e do not use sensitive personal data for ad targeting."[90]  And in a blog post titled "About Restricted Meta Business Tools Data," Facebook asserts it has "policies around the kinds of information businesses can share with us."[91]  Facebook does not "want websites or apps sending us certain restricted information about people."[92]  Sensitive information includes, among other things, "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[93]

98.     These representations are repeated frequently.  Facebook created a "Help Center" to better explain its practices to users.  In an article titled, "How does Facebook receive information from other businesses and organizations?," Facebook reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Facebook "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[94]  In another article, titled, "How does Meta work with data providers?," Facebook repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[95]

99.     A reasonable user who reads Facebook's terms and representations would understand those terms as requiring Facebook to enforce an advertiser's compliance with its terms.

---

[89] *Id.*

[90] FACEBOOK, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.

[91] FACEBOOK, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/ business/help/1057016521436966?id=188852726110565.

[92] *Id.*

[93] *Id.*

[94] FACEBOOK, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[95] HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830.

1   At a minimum, those terms and representations require Facebook to build safeguards for sensitive

2   information.   No reasonable user would read those terms and representations as permitting

3   Facebook to intentionally intercept electronic communications that it knows the law protects and

4   deems sensitive.  And no user, reasonable or not, could read those terms as allowing Facebook to

5   aid and abet another party's disclosure of such protected and sensitive information.   In short,

6   Facebook never receives consent from users to intentionally intercept and monetize electronic

7   communications disclosing sensitive information that the law protects.

8                                                  **CLASS ALLEGATIONS**

9           100.    Plaintiff seeks certification of the following class: all California residents who have

10   accessed and navigated the Website while in California (the "Class").

11          101.    Plaintiff reserves the right to modify the Class definition, including by using

12   subclasses, as appropriate based on further investigation and discovery obtained in the case.

13          102.    The following people are excluded from the Class: (1) any Judge presiding over this

14   action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents,

15   successors, predecessors, and any entity in which Defendant or its parents have a controlling

16   interest (including current and former employees, officers, or directors); (3) persons who properly

17   execute and file a timely request for exclusion from the Class; (4) persons whose claims in this

18   matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and

19   Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such

20   excluded persons.

21          103.    **Numerosity:** The number of persons within the Class is substantial and believed to

22   amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of

23   the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the

24   individual members of the Class render joinder impractical.  Accordingly, utilization of the class

25   action mechanism is the most economically feasible means of determining and adjudicating the

26   merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's

27   records.

28

104.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated CIPA §§ 631 and 632 and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

105.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, visited the Website and had his confidential electronic communications intercepted and disclosed to the Third Parties.

106.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously.  The interests of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

107.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes.  Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability.  Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

## CAUSES OF ACTION

### COUNT I

**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631(a)**

108.   Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

109.   Plaintiff brings this claim against Defendant individually and on behalf of the Class.

110.   CIPA § 631(a) imposes liability for "distinct and mutually independent patterns of conduct." *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192-93 (1978). Thus, to establish liability under CIPA § 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner," does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> *Or*
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> *Or*
>
> Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,
>
> *Or*
>
> Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

111.   CIPA § 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21

(N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *see also Javier v. Assurance IQ, LLC*, 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, Section 631(a) applies to Internet communications.").

112.    The Session Replay Providers' session replay technologies, and Facebook's Business Tools, including but not limited to the Facebook Pixel, are each a "machine, instrument, contrivance, or … other manner" used to engage in the prohibited conduct at issue here.

113.    Each of the Third Parties is a "separate legal entity that offers [a] 'software-as-a-service' and not merely a passive device." *Saleh v. Nike, Inc.*, 562 F. Supp. 3d 503, 520 (C.D. Cal. 2021).  Further, the Third Parties have the capability to use the wiretapped information for their own purposes.  Accordingly, each of the Third Parties was a third party to any communication between Plaintiff and Class Members, on the one hand, and Defendant, on the other.  *Id.* at 521; *see also Javier v. Assurance IQ, LLC*, 649 F. Supp. 3d 891, 900 (N.D. Cal. 2023).

114.    At all relevant times, by the session replay technologies and the Facebook Business Tools, the Third Parties willfully and without the consent of all parties to the communication, or in any unauthorized manner, read, attempted to read, and/or learned the contents or meaning of electronic communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other, while the electronic communications were in transit or were being sent from or received at any place within California.

115.    At all relevant times, the Third Parties used or attempted to use the communications intercepted to, *inter alia*, monitor and improve their products and services (LogRocket); research, develop, modify, improve, train, and/or support their products and services, conduct benchmarking and machine learning, and pursue other business purposes like industry analysis, analytics, and marketing (Clicktale); manage accounts, calculate fees, develop and improve their services, provide support, create and provide insights, create and provide service and feature announcements, create and provide other reporting, and pursue other business purposes (Datadog); engage in product improvement, product and service development, resource allocation and support, internal demand planning, training and developing machine learning algorithms, security and data

integrity, identification of industry trends, and benchmarking (Qualtrics); and promote and improve its advertising platform (Facebook).

116.    At all relevant times, Defendant aided, agreed with, employed, permitted, or otherwise enabled the Third Parties to wiretap Plaintiff and Class Members using the session replay technologies and Facebook Business Tools and to accomplish the wrongful conduct at issue here.

117.    Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and usage of Plaintiff's and Class Members' electronic communications.  Nor did Plaintiff and Class Members provide their prior consent to Defendant aiding, agreeing with, employing, permitting, or otherwise enabling the Third Parties' conduct.

118.    The wiretapping of Plaintiff and Class Members occurred in California, where Plaintiff and Class Members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiff's and Class Members' electronic communications to their servers.

119.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 631(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 631(a).

## COUNT II
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 632

120.    Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

121.    Plaintiff brings this claim against Defendant individually and on behalf of the Class.

122.    CIPA § 632(a) prohibits an entity from:

> intentionally and without the consent of all parties to a confidential communication, uses an electronic amplifying or recording device to eavesdrop upon or record the confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device, except a radio.

123.    The Session Replay Providers' session replay technologies, and Facebook's

Business Tools, including but not limited to the Facebook Pixel, are "electronic amplifying or recording device[s]."

124.   Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

 (i)  Personally identifiable financial information; and

 (ii)  Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

125.   Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

 (i)  A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

 (ii)  About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

 (iii)  [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

 (A)  Information a consumer provides to [a financial institution]on an application to obtain a loan, credit card, or other financial product or service;

 (B)  Account balance information, payment history, overdraft history, and credit or debit card purchase information;

 (C)  The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

 (D)  Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

(E)     Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account;

(F)     Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web server); and

(G)     Information from a consumer report.

126.    Per Cal. Fin. Code § 4052(a):

"Nonpublic personal information" means personally identifiable financial information (1) provided by a consumer to a financial institution, (2) resulting from any transaction with the consumer or any service performed for the consumer, or (3) otherwise obtained by the financial institution. Nonpublic personal information does not include publicly available information that the financial institution has a reasonable basis to believe is lawfully made available to the general public from (1) federal, state, or local government records, (2) widely distributed media, or (3) disclosures to the general public that are required to be made by federal, state, or local law. Nonpublic personal information shall include any list, description, or other grouping of consumers, and publicly available information pertaining to them, that is derived using any nonpublic personal information other than publicly available information, but shall not include any list, description, or other grouping of consumers, and publicly available information pertaining to them, that is derived without using any nonpublic personal information.

127.    Per Cal. Fin. Code § 4052(b):

"Personally identifiable financial information" means information (1) that a consumer provides to a financial institution to obtain a product or service from the financial institution, (2) about a consumer resulting from any transaction involving a product or service between the financial institution and a consumer, or (3) that the financial institution otherwise obtains about a consumer in connection with providing a product or service to that consumer. Any personally identifiable information is financial if it was obtained by a financial institution in connection with providing a financial product or service to a consumer. Personally identifiable financial information includes all of the following:

(1)     Information a consumer provides to a financial institution on an application to obtain a loan, credit card, or other financial product or service.

(2)     Account balance information, payment history, overdraft history, and credit or debit card purchase information.

(3)     The fact that an individual is or has been a consumer of a financial institution or has obtained a financial product or service from a financial institution.

(4)     Any information about a financial institution's consumer if it is disclosed in a manner that indicates that the individual is or has been the financial institution's consumer.

(5)     Any information that a consumer provides to a financial institution or that a financial institution or its agent otherwise obtains in connection with collecting on a loan or servicing a loan.

(6)     Any personally identifiable financial information collected through an Internet cookie or an information collecting device from a Web server.

(7)     Information from a consumer report.

128.   "Except as provided in Sections 4053, 4054.6, and 4056, a financial institution shall not sell, share, transfer, or otherwise disclose nonpublic personal information to or with any nonaffiliated third parties without the explicit prior consent of the consumer to whom the nonpublic personal information relates."  Cal. Fin. Code § 4052.5.

129.   Thus, Plaintiff and Class Members' "nonpublic personal information" is confidential, under federal and California law.

130.   At all relevant times, the Third Parties intentionally used the session replay technologies and Facebook Business Tools to eavesdrop upon and record such confidential communications of Plaintiff and Class Members, on the one hand, and Defendant, on the other.

131.   When communicating with Defendant, Plaintiff and Class Members had an objectively reasonable expectation of privacy, based on the GLBA and CalFIPA.  Thus, Plaintiff and Class Members did not reasonably expect that anyone other than Defendant would be on the other end of the communication, and that other, third-party entities (like the Third Parties), would intentionally use an electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

132.   Plaintiff and Class Members did not consent to any of the Third Parties' actions. Nor have Plaintiff or Class Members consented to any of the Third Parties' intentional use of an

electronic amplifying or recording device to eavesdrop upon and record the confidential communications of Plaintiff and Class Members.

133.    Pursuant to Cal. Penal Code § 637.2, Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 632(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 632(a).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    For an order declaring that Defendant's conduct violates the statute referenced herein;

(c)    For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d)    For actual, compensatory, statutory, and/or punitive in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For an order of restitution and all other forms of equitable monetary relief;

(g)    For injunctive relief as pleaded or as the Court may deem proper; and

(h)    For an order awarding Plaintiff and the Class their reasonable attorneys' fees, expenses, and costs of suit.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all causes of action and issues so triable.

1    Dated:  April 22, 2024                    Respectfully submitted,

2                                              **BURSOR & FISHER, P.A**.

3
                                              By: ___*/s/ Brittany S. Scott*_____
4                                                      Brittany S. Scott

5                                              L. Timothy Fisher (State Bar No. 191626)
                                              Brittany S. Scott (State Bar No. 327132)
6                                              1990 North California Blvd., Suite 940
                                              Walnut Creek, CA 94596
7                                              Telephone: (925) 300-4455
                                              Facsimile: (925) 407-2700
8                                              Email: ltfisher@bursor.com
9                                                      bscott@bursor.com

10                                             *Attorneys for Plaintiff*

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28